### LINDROTH v. LITCHFIELD.

*(Circuit Court, S. D. Iowa.    May Term, 1886.)*

1. PRINCIPAL AND AGENT—RATIFICATION.
   A principal who receives and appropriates purchase money of land sold by his local agent for him, and rents collected, and who likewise appropriates repairs made on his real estate by such agent, thereby ratifies the agency, and is estopped from repudiating the action of such agent in any transaction within the general scope of the business.

2. SAME—GENERAL AGENCY.
   Under such circumstances, the agency becomes, not special, but general, and third persons dealing therewith are entitled to actual notice from the principal of any restriction of the agent's authority, though in a special agency the contrary is true.

In Equity.

*Good & Phillips,* for complainant.

*C. H. Gatch,* for defendant.

LOVE, J. The question in this case is whether or not J. H. Brown had due authority to bind Edwin C. Litchfield by the contract of sale to Charles A. Lindroth which bears date at Ogden, August 16, 1881.

After going carefully over the evidence, I must express my surprise that any serious doubt should have arisen about the authority to make the contract in question. That John H. Brown was the general agent of Litchfield at the Ogden office, with authority, so far as third persons were concerned, to do and perform all the business of Litchfield connected with that office, and that the sale of lands was not only a part of its business, but its chief purpose, seems to me to be established by the evidence beyond all reasonable doubt. E. C. Litchfield owned a large quantity of land in Iowa, situated in several different counties. He was desirous of selling these lands, and he had them upon the market for sale. John Brown, of Des Moines, was his general agent, not only for the sale of Litchfield's lands, but for the management of all things connected with them. It is evident that the sale and management of so many thousands of acres, covering a large extent of country, could not be successfully conducted from the single, and, as to a large part of the land, distant, office at Des Moines, where John Brown resided. So, at least, thought the parties concerned; for they established other offices nearer to the great body of the lands, for the purpose of managing and selling the property. One of these offices was opened at Ogden. Now, John Brown, the chief agent, could not attend in person to the business of the agency at the different places where the subordinate offices were opened. Therefore the appointment of subagents was a matter of necessity, and, in my opinion, the power of John Brown to appoint subagents was clearly implied from the very nature of the business committed to him by his principal.

We find John H. Brown at the head of the Ogden office, and in full management of its business. It matters not by whom he was appointed,—whether by Litchfield or by John Brown, his father, who had implied authority to place him in charge of that office. No doubt he was placed there by his father, and acted in subordination to the latter. I am satisfied myself, from the evidence, that Litchfield knew of John H. Brown's subagency, and that he recognized it in various transactions; for the evidence is clear and satisfactory that John H. Brown sometimes corresponded directly with Litchfield, made remittances to him for sales and collections, and delivered deeds executed by Litchfield, on sales made by himself as agent. There is evidence, moreover, that Litchfield was once, at least, at Ogden; that he was seen with John H. Brown; and that the latter introduced him to various persons found there. It is, in my opinion, in the highest degree improbable that Litchfield did not know of John H. Brown's subagency.

John H. Brown was, for a number of years, in charge of Litchfield's business at Ogden. It was not for a day or a month, or even a single year, but for a number of years, that he was so engaged. It is in evidence by witnesses who personally knew the facts that John H. Brown made sales of Litchfield's property, and received the purchase

money, in whole or part; that he made remittances to Litchfield, and delivered deeds executed by him; that he attended to the payment of Litchfield's taxes, and deposited money to redeem land which had been sold for taxes; that he attended to Litchfield's land suits, and made numberless affidavits as his agent; that he purchased lumber, and made repairs upon improved farms that belonged to Litchfield; that he deposited in bank money which he said belonged to Litchfield; and that he drew the same out, to be remitted to Litchfield; and that he collected rents and made collections for Litchfield; all this, and much more, for a series of years.

In view of these facts, it seems to me preposterous to assert that John H. Brown was not the general agent of Litchfield, though no doubt subordinate to his father, for the transaction of Litchfield's business connected with the Ogden office, and that Litchfield was not aware of the fact that he was so acting. I make no doubt that Litchfield's chief correspondence was with John Brown, the father; but that he had more or less direct communication with John H. Brown concerning the business of the subagency there can be no doubt.

This is placed beyond all question by the evidence, and especially by the testimony of William A. Kelly, an unexceptionable witness, who speaks from personal knowledge. See his testimony on his cross-examination by defendant's counsel.

It would be impossible, in this written view, to go particularly into the evidence, but reference to a few established facts may be convincing in this connection. J. S. Pitman, the postmaster at Ogden, testifies, on cross-examination by defendant, that he had seen correspondence coming from Litchfield's office, New York, to J. H. Brown; had read in Brown's office some of the correspondence; saw more or less of it from 1876 to 1882; was postmaster at Ogden during those years, and J. H. Brown mailed a great deal of matter to Litchfield, and a great deal of matter from Litchfield's office came to J. H. Brown; and that J. H. Brown often showed him deeds, contracts, and letters from Litchfield's office. There is a great mass of evidence proving conclusively that J. H. Brown was in full charge and control of the Litchfield land-office at Ogden; that he was a general agent for the supervision, sale, and management of Litchfield's lands there; and that Litchfield knew of his agency, and recognized it. The witnesses testify, in many cases, from personal knowledge, and not from the report of others, or hearsay, as affirmed in the written argument presented by the defendant.

If, therefore, the general agency of John H. Brown, and his consequent authority, so far as third persons were concerned, to make the sale in question, depended upon the recognition by Litchfield of such general agency, I could entertain no doubt of the validity of the sale in question. But in my opinion the validity of that sale can be sustained without any such recognition on the part of Litchfield.

The fact is beyond question that a subagency was established at Ogden, the chief purpose of which was the sale of Litchfield's land. Does any one question that the office was opened there with full and competent authority, and that Litchfield knew of its existence? Does any one question the authority of John Brown to establish for Litchfield the land-office at Ogden? The evidence is entirely satisfactory to me that this office, and its purpose, was known to Litchfield; that it was in fact his office; and that, at the death of John Brown, his agents took possession of the books, papers, etc., appertaining to it.

Now, this office was established mainly for the purpose of selling Litchfield's lands, and, connected therewith, the payment of taxes, the redemption of land sold for unpaid taxes, the collection of moneys due Litchfield on sales, etc. The office was placed in charge of John H. Brown. No notice was given, as it appears, even by general publication, of any restriction upon his authority. Now, what might third persons dealing with John H. Brown, under such circumstances, assume as to his power to make sales, and receive money upon sales? J. H. Brown was clearly not a special agent. He was not authorized to do some one particular act for his principal,—such as to sell some one tract of land, or to execute a deed, or to collect a given sum of money, or to redeem particular land from sale. He was a general agent, with power to do any and all acts within the scope of the business committed to him. Had third persons not a clear right to assume that he was empowered to sell Litchfield's land, and to recieve money in payment, or part payment, of the same? Was the sale of land not within the scope of that business? Nay, was it not the chief purpose for which that agency was established, and had third persons not a right to assume that the person placed in charge of it was empowered to do what it was the leading purpose of the office to accomplish?

This agent performed, without special authorization, all the other duties of the office. He paid taxes; collected and remitted money; made affidavits as agent; purchased lumber for repairs; deposited in the bank the money of his principal, and remitted the same; kept the books; made monthly reports,—in a word, did anything and everything pertaining to the office at Ogden. No one questions that he had, by virtue of his office, authority to do all these things. Were purchasers of land to take notice, without any warning whatever, that the one thing this agent could not do without special authority was the very thing that the office was mainly established to accomplish, namely, the sale of his principal's land? If a merchant, at a distance, should establish a house for the sale of merchandise, and put it in charge of an agent, would not that agent have full power to make all sales within the ordinary scope of that business, and according to its usages? In such case, would any instructions to the agent, not notified to third persons, restraining his authority to sell, or directing his manner of making sales, contrary to the usages of the

trade, be of the least avail in respect of the validity of sales made by the agent to third persons? None whatever.

It is said by counsel that the particular sale in this case was not reported to Litchfield; that it was never ratified or approved by him; that it was contrary to his prescribed forms and terms; that it was a "sale in short," so called, whereas Litchfield had prescribed printed forms of sale to his agents, etc. But it is not pretended that the purchaser had any notice or knowledge whatever of any of these things. How could he be affected by such limitations of the agent's authority without notice? Did the agent, in his manner of selling, proceed contrary to the usages of that business? Was it not within the usual and ordinary scope of such an office for the agent to effect the sale, make a memorandum of it in writing, and receive the cash payment? If the agent had authority to receive the cash payment, and if he did receive it, acting within the scope of his employment, it would work a manifest fraud upon the purchaser to allow Litchfield to repudiate the sale on the ground that the agent failed to act according to his private instructions. It is said that it behooves every person dealing with an agent, and knowing that he professes to act according to authority, and so bind another, to look to the authority of the agent, and see that he does not transcend its limitations. This is the law in regard to special agencies, but it is not the law of such an agency as this, which was not a particular, but a general, agency.

Litchfield was bound by all the acts of J. H. Brown within the scope of the business of that office, except in cases where third persons had notice of some restriction upon his authority. The giving of assent to assignments, as the evidence shows, was a transaction within the line of its ordinary business. Where J. H. Brown gave such assent and received payments from the assignee, Litchfield is estopped, whether Brown accounted to him or not. As to the mode in which the written memorandum of sale was made and signed in this case, it is wholly immaterial. John H. Brown was authorized to sell the land. He did sell it, and receive the first payment. Under such circumstances the sale was binding without any written memorandum at all. The memorandum in writing which he gave to the purchaser was, at most, only evidence of the contract. It was not essential to its validity, a payment having been made. I do not mean to say that a contract signed by J. H. Brown, exactly in the way the present one was executed, would not be good without any payment. If it were necessary to decide that question upon the evidence now before me, I should not hesitate to hold the execution of the instrument sufficient to bind Mr. Litchfield.